Date signed August 18, 2009



_____
PAUL MANNES
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| ROBERT F. ROOD, IV | : | Case No. 08-17199PM |
| THE SOURCE, LLC | : | Case No. 08-26854PM |
| BLUE HORSESHOE PORTFOLIO | : | Case No. 08-26859PM |
|    SERVICES, LLC | : | |
| LEVEL ONE CAPITAL PARTNERS, LLC | : | Case No. 08-26862PM |
| BLUE HORSESHOE CAPITAL, LLC | : | Case No. 08-26865PM |
| MATTERHORN FINANCIAL, LLC | : | Case No. 08-26866PM |
| LEVEL ONE CAPITAL PARTNERS, | : | Case No. 08-27099PM |
|    a MD LLC | : | |
|        Debtors | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| GARY A. ROSEN, TRUSTEE | : | |
| SOUTHERN MANAGEMENT | : | |
|   CORPORATION RETIREMENT TRUST | : | |
| | : | |
|        Plaintiffs | : | |
|    vs. | : | Adversary No. 09-0188PM |
| | : | |
| ROBERT F. ROOD, IV, et al. | : | |
| | : | |
|        Defendants | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |

### MEMORANDUM OF DECISION

Before the court is the Motion for a Preliminary Injunction filed by Plaintiff Gary A.

Rosen, Chapter 7 Trustee ("Trustee") of the estates of Robert F. Rood, IV, The Source, LLC,

Blue Horseshoe Portfolio Services, LLC, Level One Capital Partners, LLC, Blue Horseshoe

Capital, LLC, Matterhorn Financial, LLC and Level One Capital Partners, a MD LLC

(collectively "Debtors"), and by Plaintiff Southern Management Corporation Retirement Trust ("SMCRT") against Defendants Robert F. Rood, IV ("Rood" or "Debtor"), Charles Timothy Jewell ("Jewell"), Nik Hepler, Whiplash Motor Sports, LLC, Source Bio-Plastics, Inc., Kore Holdings, Inc., Arcadian, Inc., Level One Mortgage Capital, Sunvolt, Mortgage American Bankers, First Washington Financial Corporation, Grace Anne Rood, Robert F. Rood, III, Warren A. Hughes, Jr. and First Washington Equities, LLC.[1]  The Complaint for Injunctive Relief, Declaratory Relief and Damages seeks a preliminary injunction against these Defendants, enjoining them and any agent or representative acting for them directly or indirectly from taking any action or making any transfers of any property or assets or engaging in any financial or business transactions including, but not limited to, any transactions involving, directly or indirectly, any and all assets of Rood, Debtors or Defendants.  The matter came before the court for hearing over five days.

SMCRT is the holder of a non-dischargeable judgment entered by default against Debtor in the sum $13,876,353.47.  This judgment arose out of various fraudulent schemes conducted by Rood and others whereby they misappropriated funds that were to have been invested by Debtor on behalf of SMCRT.  This dreary history is set out in the Verified Complaint to Determine Dischargeability of Debt (Adversary No. 09-0058) filed in this court on January 30, 2009.  An additional judgment was entered in favor of Tysons Financial, LLC, against Debtor in the sum of $2,626,189.30.  Debtor's written waiver of discharge was approved by an Order of this court entered March 12, 2009.

The polestar finding of fact guiding this opinion is that the testimony of the principals of the Rood entities[2] (Rood and Jewell), was  wholly unworthy of belief.  Debtor is a convicted felon, having pleaded guilty in the case of *State of Maryland v. Robert F. Rood, IV*, Criminal No. 111718, in the Circuit Court for Montgomery County, Maryland.  That case involved a similar fraudulent scheme of Debtor involving Village Bar and Grill, Inc., where $205,000.00 was wired

---

[1]  Plaintiffs withdrew their request for a preliminary injunction as to Rood's parents, Grace Rood and Robert F. Rood, III.

[2]  The "Rood entities" include The Source, LLC, Blue Horseshoe Portfolio Services, LLC, Level One Capital Partner, LLC, Blue Horseshoe Capital, LLC, Matterhorn Financial, LLC, Level One Capital Partners, a MD LLC, Whiplash Motor Sports, LLC, Source Bio-Plastics, Inc., Kore Holdings, Inc., Arcadian, Inc., Level One Mortgage Capital, Sunvolt, Mortgage American Bankers, First Washington Financial Corporation and First Washington Equities, LLC.

to Debtor for the purpose of obtaining a Letter of Credit.  The court is further advised that the United States Attorney for the District of Columbia has under consideration a second criminal proceeding against Debtor.  Jewell admitted that the internet site that he created for Jet Stream, Inc. was never truthful.  Another glaring example of Jewell's misconduct is his filing of a false 8-K report with the Securities and Exchange Commission ("SEC") describing a Memorandum of Understanding with Jet Stream, Inc. that never existed.  Jewell testified that "his" SEC lawyer was Christopher Evan who was also described as the corporate attorney for Jet Stream Voltage, Inc., a related company said to be engaged in wind production of energy.  Evans testified that he was not a member of the Virginia Bar, not could he be described as the SEC lawyer for companies associated with Jewell.  Contrary to what was stated in Ex. 50, an 8-K Report submitted to the SEC by Rood, Jewell testified that the "wind assets" were never transferred to Jet Stream, Inc.

It is clear to the court that Jewell and Rood had no apparent source of income other that the SMCRT funds.  This adversary proceeding was filed in an effort to recapture those misappropriated funds and is a continuation of efforts started in state court in which Thomas Murphy, a member of the Maryland Bar, was appointed Receiver for various Rood entities.  While Debtor appears to have done all possible to frustrate the efforts of the Receiver, and subsequently the Trustee, to trace the missing funds, the Receiver and the Trustee have reconstructed a substantial part of the records following a seizure of computers from business premises, gleaning information therefrom and with analysis by Susanne Hillman, a qualified forensic expert.  Ms. Hillman was assisted by Jaren Stern, an IT specialist.  The records were examined page by page.  Ms. Hillman's testimony established that $1,083,803.06 was paid to Rood out the Blue Horseshoe and Level One accounts and these same accounts were the source of $1,281,629.55 paid for the benefit of Kore Holdings, Inc.,[3] and its subsidiaries.  These

---

[3] The court would be remiss to not comment on the farcical nature of Kore Holdings, Inc. – a publicly traded shell corporation out of compliance with SEC requirements with no legitimate business other than to further Jewell's schemes.  This entity is traded on the pink sheets at $.02 a share and trading activity is minimal. Its value is as a vehicle for a reverse merger with a private company, or, as the court suspects, to further improper activity as such funds as it has can be traced to the Rood entities. *See generally*, FELDMAN, DAVID N., *Reverse Mergers + Pipes: The New Small-cap IPO Reprinted and Updated from Pipes: Revised and Updated Edition--A Guide to Private Investments in Public Equity. (Bloomberg Press, 2005)*, 3 Bus. L. Brief (Am. U.) 34 (Spring 2007).  Its alleged ownership of "coal assets" seems dubious at best, considering the claim that its assignor defaulted on its contractual obligations to the

expenditures included accounting charges, filing fees, headquarters fee, legal and professional fees, and various payments on behalf of Kore Holdings, Inc.'s subsidiaries.  There was no evidence of consideration for any payment made from the Blue Horseshoe and Level One funds to the Rood entities. These entities handled the transferred funds as their own.

The record keeping by the Rood entities (to the extent there was such) was wholly inadequate.  There were no formal records or financial statements for Blue Horseshoe or Level One entities, and such information that had been supplied to SMCRT and the Receiver did not match actual events that could be verified.  The Rood entities operated in no less than 40 bank accounts.  The payroll records of the various entities were commingled, and such compensation as was paid to the Rood associates was typically paid outside of the payroll.  Generally, what Rood would do is take money out of Blue Horseshoe and Level One accounts and convert the funds to money orders.  In short, Rood used the SMCRT funds that were entrusted to him to invest on its behalf as his personal piggy bank.

Although the money trail of the millions of dollars of misappropriated funds has been difficult to illuminate, some transactions are known.  Rood forged SMCRT's approval of a release of a transaction known as the Eastern Shore Loan and then diverted the proceeds to the Rood entities.  Another example involves $40,000.00 wired from the Blue Horseshoe account for the purchase of Kore Holdings, Inc. stock.  Jean D. Hughes, the mother of another Rood associate, Warren Hughes, was the recipient of a SMCRT-funded "loan" of which none of the proceeds were ever re-paid.  The device used was to create an escrow for the one year's interest and to the surprise of no one the balloon payment due at the end of the year was never made. The "borrower" suffered from diabetes, kidney failure and a bad heart. The proceeds of the funds advanced by SMCRT were used for the construction of a stair lift, a special bath tub and generally to make the home "handicapped friendly."  She filed two bankruptcy cases in the District of Columbia, both of which were dismissed without a discharge.   SMCRT's position was wiped out by a senior creditor's foreclosure.  Another example is an action filed by Capital Marin against Rood dealing with accounting for escrow funds.  The action was settled by Rood for a payment of $80,000.00.  These funds used came from Blue Horseshoe or Level One.

<u>Conclusions</u>

---

counter-party.  If it received any income in the last year, that was news to Rood.  Rood considered a sale of 13,000 shares unusual.  Such a sale would have involved a sum of $260.00 to $2,600.00 depending on the reported yearly price spread of $0.02 to $0.20.

In the case of *The Real Truth About Obama, Inc., v. Federal Election Commission*, __ F.3d __, 2009 WL 2408735 *2 (CA4 August 5, 2009), the Fourth Circuit noted what must be shown to obtain a preliminary injunction in order to meet the Supreme Court's standard for preliminary injunctions stated in *Winter v. Natural Resources Defense Council, Inc.*, __ U.S. __, 129 S.Ct. 365, 374-376 (2008):

> In its recent opinion in *Winter*, the Supreme Court articulated clearly what must be shown to obtain a preliminary injunction, stating that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 129 S.Ct. at 374. And all four requirements must be satisfied. *Id*. Indeed, the Court in *Winter* rejected a standard that allowed the plaintiff to demonstrate only a "possibility" of irreparable harm because that standard was "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 375-76.

Plaintiffs have met their burden by a large measure.  There is a strong likelihood that they will prevail on the merits.  There is nothing in the record remotely suggesting anything other than the fact that the Rood entities misappropriated SMCRT's funds.  There is also nothing in the record to show that the source of funds for these entities was anything other than the SMCRT funds.  If the injunction is not granted, SMCRT and the bankruptcy estate will suffer irreparable harm, as the remaining funds will undoubtedly be dissipated and beyond recovery.  The balance of equities is heavily weighed in favor of Plaintiffs.  The public interest is best served by the extraordinary relief of the issuance of a preliminary injunction to prevent further harm to SMCRT.

Plaintiffs shall submit an appropriate order.


cc:     Plaintiffs
        Defendants


**End of Memorandum**