**SO ORDERED**



UNITED STATES BANKRU~~~~~~~~~~
FOR THE DISTRICT OF ~~~~~~~
at Greenbelt

PAUL MANNES
U. S. BANKRUPTCY JUDGE

In Re:                                                          :
                                                                :
ROBERT F. ROOD, IV                                              :    Case No. 08-17199PM
THE SOURCE, LLC                                                 :    Case No. 08-26854PM
BLUE HORSESHOE PORTFOLIO SERVICES, LLC                          :    Case No. 08-26859PM
LEVEL ONE CAPITAL PARTNERS, LLC                                 :    Case No. 08-26862PM
BLUE HORSESHOE CAPITAL, LLC                                     :    Case No. 08-26865PM
MATTEHORN FINANCIAL, LLC                                        :    Case No. 08-26866PM
LEVEL ONE CAPITAL PARTNERS, a MD LLC                            :    Case No. 08-27099PM
                                                                :
                    Debtors                                     :    JOINTLY ADMINISTERED
                                                                :    Under Case No. 08-17199
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
GARY A. ROSEN, CHAPTER 7 TRUSTEE and                            :
SOUTHERN MANAGEMENT CORPORATION                                 :
    RETIREMENT TRUST                                            :
                                                                :
                    Plaintiffs                                  :
        v.                                                      :    Adversary No. 09-0188PM
                                                                :
KORE HOLDINGS, INC; ARCADIAN, INC.; FIRST                       :
WASHINGTON FINANCIAL CORPORATION; LEVEL                         :
ONE MORTGAGE CAPITAL; MORTGAGE                                  :
AMERICAN BANKERS; SOURCE BIO-PLASTICS, INC.:
SUNVOLT; WHIPLASH MOTOR SPORTS, LLC;                            :
ROBERT FULTON ROOD, IV; CHARLES TIMOTHY                         :
JEWELL; NIK HEPLER; GRACE ANN ROOD; ROBERT                      :
F. ROOD, III; WARREN A. HUGHES, JR.; and FIRST                  :
WASHINGTON EQUITIES, LLC,                                       :
                                                                :
                    Defendants                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

**MEMORANDUM OF DECISION**

This matter came before the court for the trial of a Complaint filed by Gary A. Rosen, as Chapter 7 Trustee of the above-captioned estates (the "Trustee"), and Southern Management Corporation Retirement Trust ("SMCRT") (collectively, the "Plaintiffs").  SMCRT is a trust that was created to manage the pension funds of employees and officers of Southern Management Corporation.  SMCRT holds a nondischargeable judgment, entered by default, against Debtor-Defendant Robert F. Rood, IV ("Rood") in Adversary Proceeding No. 09-00058 brought in Rood's Chapter 7 Case No. 08-17199, in the amount of $13,876,353.47.[1]  This judgment arose out of a fraudulent scheme whereby funds placed in Rood's hands to invest on behalf of SMCRT were misappropriated.

The instant Complaint was filed against Rood;[2] Kore Holdings, Inc.[3] ("Kore"),  a publicly held Nevada corporation with its principal place of business in Maryland; Kore's wholly owned subsidiaries Arcadian, Inc., First Washington Financial Corporation, Level One Mortgage Capital, Mortgage American Bankers, Source Bio-Plastics, Inc., Sunvolt, and Whiplash Motor Sports, LLC (collectively known as "the Kore subsidiaries"); Rood's parents, Robert F. Rood, III and Grace Ann Rood (collectively, the "Roods");[4] Charles Timothy Jewell ("Jewell"); Nik

---

[1]  The judgment to be entered in this case is subject to the "single recovery" rule, that is, only a single recovery is allowed where the same damages are sought under different legal theories.  *Conway v. Icahn & Co.*, 16 F.3d 504, 511 (CA2 1994).

[2]  On April 7, 2010, Rood acting *pro se* filed a second bankruptcy case in the United States Bankruptcy Court for the Southern District of Florida, Case No. 10-18984-EPK, this time under Chapter 11.  That case was transferred to this court on the motion of the Plaintiffs herein, assigned Case No. 10-22378, and consolidated with Rood's existing Chapter 7 case in this court. While Rood thereafter sought to dismiss the Chapter 11 case, this court converted it to a case under Chapter 7 on August 31, 2010.

[3]  Rood filed a Chapter 11 case on behalf of Kore in the United States Bankruptcy Court for the District of Nevada on April 7, 2010.  That case was transferred to this court, assigned Case No. 10-19436, and converted to a case under Chapter 7 on motion of the United States Trustee on August 23, 2010.

[4]  By Orders entered June 5, 2009, and March 12, 2010, all counts against the Roods were dismissed.  The Plaintiffs filed a Notice of Appeal as to these Orders on June 15, 2009, and

Hepler ("Hepler");[5] Warren A. Hughes, Jr. ("Hughes");[6] and First Washington Equities, LLC ("FWE").[7]  At the time of the filing of the Complaint, Rood was acting as the President and Chief Executive Officer of Kore and FWE, and Jewell was the Chief Operating Officer of Kore. Hepler and Hughes were associates of Rood.

## I.    Events Leading Up To The Complaint

SMCRT and Rood commenced a business relationship in late 2005, whereby SMCRT agreed to fund and purchase private loans originated by Rood and his affiliated entities.  These entities, hereinafter referred to as the "Debtor Entities" or the "Rood Entities," included The Source, LLC; Blue Horseshoe Portfolio Services, LLC ("Blue Horseshoe Portfolio"); Level One Capital Partners, LLC ("Level One"); Blue Horseshoe Capital, LLC ("Blue Horseshoe Capital"); Mattehorn Financial, LLC; and Level One Capital Partners, a MD LLC.  The primary purpose of each loan was to fund construction and renovation projects.  The loans were to be secured by at least one parcel of real property.  Rood arranged matters so that SMCRT never had direct contact

March 22, 2010, respectively.  By Orders entered March 17, 2010, and March 22, 2011, the District Court affirmed this court's June 5, 2009 Order and this court's March 12, 2010 Order granting summary judgment on the conversion claim, but reversed as to the fraudulent conveyance claim.  *In re Rood*, 426 B.R. 538 (D. Md. 2020) and 448 B.R. 149 (D. Md. 2011). The case was remanded to this court for further proceedings.  Inasmuch as the trial proceeded without the participation of the Roods, the court will enter a final judgment in this case as to the remaining defendants pursuant to Fed. R. Civ. P. 54(b) made applicable to adversary proceedings by Fed. Rule of Bankruptcy Proc. 7054 and schedule a trial on the remaining counts against the Roods.

[5]  Hepler filed a voluntary petition under Chapter 7 in this court on April 6, 2010 (Case No. 10-17406), the first day of trial in this adversary proceeding.  By Order entered April 19, 2010, the court granted SMCRT's motion for relief from stay to permit this trial to proceed (D.E. No. 17).  The court granted Plaintiffs an extension of time until after the conclusion of this case to file a nondischargeability action against Hepler.  Although subpoenaed to testify at trial, he did not appear.

[6]  Hughes filed a voluntary petition under Chapter 7 in this court on April 13, 2010 (Case No. 10-18069).  That case was dismissed for Hughes' failure to complete required filings.

[7]  A default judgment was entered against FWE by Order entered June 24, 2009 (D.E. No. 114).

with borrowers.  He would present the loan applications and supporting documentation to SMCRT's loan committee, and after an application was approved, SMCRT would wire the loan proceeds to a settlement agent designated by Rood (rather than directly deposit money with Rood or the Debtor Entities).

Consistent with this arrangement, SMCRT made thirty-two loans through Rood between April 2006 and September 2007.  SMCRT's principals first expressed concerns regarding Rood's management of the loan portfolio in September 2007, when Rood failed to cooperate after being asked to "account for the borrowers' funds that were in his possession."  Trial Tr., David Hillman[8] Test., 4/14/10, 75.  After Rood produced a letter from his attorney stating that he was under no obligation to provide the requested information to SMCRT, *id*. at 77, SMCRT's accountants, Hillman & Glorioso, P.L.L.C. ("H&G"), undertook an investigation into Rood's accounting records.  Rood did not comply with repeated requests by H&G for information. Instead, he selected an accountant to prepare a "Special Purpose Review."  This report, prepared by Lloyd Mallory, C.P.A. ("Mallory"), stated that M-Financial Services, Inc. had "reviewed and verified all loans serviced by Level One Capital Partners, LLC and Blue Horseshoe Capital, LLC" and "verified that all Borrower's Construction Reserves have been properly managed and disbursements to the borrowing entities have been made in accordance with the procedures outlined by [Level One] and [Blue Horseshoe Capital] and agreed to by [SMCRT] and [Tysons Financial, LLC]." Pl. Ex. 463.  The report concluded that "[b]ased on our review, we are not aware of any material modifications that should be made to any of the loan files nor any discrepancy between what has been reported regarding the loan files and any bank balances associated with holding the Borrower's Construction Reserves 'in trust'."  Pl. Ex. 463, 1.

Notwithstanding the conclusions of the Special Purpose Review, Plaintiffs discovered that the Defendants were commingling and misusing SMCRT loan proceeds for personal gain. In early March 2008, SMCRT was contacted by borrowers who were unable to access SMCRT funds that Rood was allegedly holding for them (Trial Tr., David Hillman Test., 4/14/10, 79). Accordingly, on May 9, 2008, SMCRT filed suit against Rood, Blue Horseshoe and Level One in the Circuit Court for Montgomery County.  Pursuant to a Temporary Restraining Order issued

---

[8]  David Hillman was a trustee of SMCRT.

by the Circuit Court, a trustee was appointed to examine all books, records and files pertaining to SMCRT's loan portfolio.  Rood filed the instant  Chapter 7 case on the day before a hearing in the Circuit Court regarding the appointment of a permanent receiver and the granting of a preliminary injunction.[9]  After Rood's bankruptcy filing, the Circuit Court took no further action as to him but entered an Order appointing Thomas Murphy, Esq. ("Murphy") as receiver, together with an Order enjoining the Debtor Entities from misappropriating funds and dissipating assets.  Murphy filed an *ex parte* motion for right of entry, asserting that his private investigator saw evidence of large-scale destruction and disposal of documents at the office used by Rood located at 4845 Rugby Avenue, Bethesda, Maryland (the "Rugby Avenue Office").  Plaintiffs allege that Rood, Jewell, Kore, and FWE all participated in this document destruction and disposal.  Upon the court's granting of Murphy's motion, Murphy proceeded to seize all items authorized under the Circuit Court Order, including bank records, loan files, computers, and electronic storage devices located at the Rugby Avenue Office.

At the meeting of creditors held in the Chapter 7 cases of Rood and the Debtor Entities pursuant to 11 U.S.C. § 341 on July 2, 2008, questions were raised as to the origin of Rood's income and the extent of support received by Rood from his parents.   Rood  invoked his Fifth Amendment privilege with respect to these and other issues that came to light during the §341 meeting (such as whether any of the Debtor Entities received money in connection with the closing of SMCRT loans).  Shortly thereafter, SMCRT filed an Emergency Motion for Rule 2004 Examination that was granted by Order entered July 21, 2008, whereby Rood was directed to produce all documents listed in the Rule 2004 Motion and to appear for examination.[10]  Rood did not provide any of the required documents until the court scheduled a hearing on SMCRT's motion to compel production.  Plaintiffs assert that the five folders of documents produced were organized by Rood, Jewell and Hughes "in a self-serving manner designed to confuse and delay

---

[9]  Each of the Rood-controlled Debtor Entities was then placed into Chapter 7 by the Trustee.

[10]  Rule 2004 examinations were also taken of Kore (with Jewell as its corporate designee) and Hepler.

a complete production." At the August 20, 2008 hearing on SMCRT's motion to compel, Rood was ordered to produce all required documents. D.E. No. 60. Rood repeatedly failed to produce the requested documents and, on multiple occasions, the Plaintiffs revisited the issue of Rood's lack of compliance, leading to the entry of a Consent Order on Suggestion of Contempt on September 18, 2008, "whereby [Rood] agreed to make his offices and home immediately available for a videotaped inspection, to disclose storage facilities in his control, to turn over his PDA device, and to make best efforts to produce all documents requested by the Plaintiffs." The inspection yielded evidence that a number of the requested documents had not yet been produced. Plaintiffs argued that certain Defendants (namely, Hepler, Jewell, and Rood, Sr.) had the opportunity to remove documents prior to the inspection.

## II.  Procedural History

This Complaint was filed by the Plaintiffs on April 1, 2009. Plaintiffs also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injuction (the "Preliminary Injunction Motion"), seeking to enjoin the Defendants and any agent or representative acting for them directly or indirectly from taking any action or making any transfers of any property or assets or engaging in any financial or business transactions including, but not limited to, any transactions involving, directly or indirectly, any and all assets of Rood and various entities owned by Rood, Kore and FWE.

The court held hearings on the Preliminary Injunction Motion on April 2, 13, 22, 29, and 30, 2010 and May 28, 2010. At the hearing on April 13, the court orally ordered the production of subpoenaed documents (namely, a post-petition agreement between one of Kore's wholly owned subsidiaries, Arcadian Renewable Power, Inc., and Jet Stream Voltage, Inc.) by April 17, 2009. Upon the failure of Kore and Rood to produce the documents, the Plaintiffs filed an emergency motion seeking entry of an order to show cause why Rood and Kore should not be held in civil and criminal contempt for their failure to comply with the subpoena. On June 19, 2009, the court handed up a Certificate of Criminal Contempt for such action as may be deemed appropriate by the United States District Court for the District of Maryland (the "District Court"). D.E. No. 108.

On September 8, 2009, the court entered an Order granting the Plaintiffs' Preliminary

Injunction Motion (the "Preliminary Injunction Order").   Kore and Jewell filed motions to reconsider this Order that were denied by Orders entered September 23, 2009.  Kore appealed the entry of the Preliminary Injunction Order and filed a motion to stay pending appeal.  The motion to stay was denied by Order entered October 8, 2009.

On October 27, 2009, the District Court entered a Memorandum Opinion with respect to the Certificate of Contempt, stating that a referral to the United States Attorney was necessary in order for the matter to go forward.  By Order of even date, the District Court directed the parties to submit memoranda in accordance with its Memorandum Opinion.  On November 17, 2009, Plaintiffs filed an emergency motion to enforce the Preliminary Injunction Order and to request the entry of an order directing Rood to show cause why he should not be found in civil contempt and why another certificate of criminal contempt should not be issued against him and referred to the United States Attorney.  On December 14, 2009, the court handed up a second Certificate of Criminal Contempt.  Rood filed a Notice of Appeal with respect to the second Certificate of Criminal Contempt on December 28, 2009.  On March 17, 2010, the United States District Court for the District of Maryland entered an Order dismissing Kore's appeal of the Preliminary Injunction Order on the ground that, inasmuch as it was an interlocutory order, Kore had failed to make the requisite showing with respect to a motion for leave to appeal.

Trial of this adversary proceeding was held on April 6, 7, 8, 9, 14, and 15, 2010; May 27 and 28, 2010; June 8, 2010; and July 15, 2010.  Hepler did not appear at trial, ignoring the subpoena served upon him to compel his attendance.  D.E. No. 475.  Prior to the last day of the trial, on July 12, 2010, the court entered an Order prohibiting Rood from giving any testimony.  D.E. No. 527.  On the last day of trial, the parties were instructed to file proposed findings of fact and conclusions of law.  Post-trial status hearings were held on October 21, 2010, and December 14, 2010.

### III.    Analysis

The counts remaining are Count I (Fraud), Count III (Civil Conspiracy), Count VI (Unauthorized Post-Petition Transfers of Assets), Count VII (Turnover), Count VIII  (Fraudulent Conveyance of Corporate Assets Under Maryland law), Count X (Recovery of Fraudulent Conveyances), Count XI (Accounting), Count XII (Injunctive Relief), and Count XIII

(Declaratory Relief).[11]


## Fraud

The Complaint alleges that each Defendant made false representations in the effort to obtain funds from SMCRT.  Plaintiffs allege that this fraudulent scheme is evidenced by the fact that, of the $16 million advanced by SMCRT in connection with the various loans said to be originated and managed by Rood, only eight loans (totaling approximately $3 million) were repaid.  With respect to the remaining twenty-four loans, Plaintiffs allege that,

> Rood, by or through the assistance of the Defendants, diverted loan proceeds for several loans by directing borrowers to remit loan payoffs directly to one of the [Rood entities] without the knowledge or authorization of SMCRT, which owned the loans.  Rood then misappropriated escrowed funds.  Additionally, Rood never closed on certain loan transactions leading SMCRT to believe that it was a secured lender for a bona fide borrower, when in fact, the Debtor, with the assistance of the Defendants had absconded with the money.  [Compl. ¶ 27].

The details of a number of the loans that were a part of this fraudulent scheme are set forth in the Plaintiffs' Proposed Findings of Fact and Conclusions of Law (hereinafter, "Plaintiffs' Memorandum") and will be described *infra* as part of the court's analysis of the factual and legal issues presented by this case.

Under Maryland law, to prevail on a claim for fraud, a plaintiff must show:  (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.  *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (Md. 2008).   Plaintiffs must prove each element of fraud by clear and convincing evidence.  *VP Corp. v. Wrexham Aviation Corp*., 350 Md. 693, 703, 715 A.2d 188, 193 (Md. 1998).

The fraud claim set forth by Plaintiffs is based primarily on statements and actions of

---

[11]  The other counts were abandoned as unnecessary in Plaintiffs' Proposed Findings of Fact and Conclusions of Law [4].

Rood, Jewell and Hepler.  The Complaint, along with the Plaintiffs' Memorandum, provides a litany of examples of false statements made by Rood.  In general, it is alleged that he "engaged in fraudulent conduct by forging and falsifying documents, including loan applications and certificates of satisfaction, and by knowingly and intentionally misrepresenting the property valuations and other encumbrances on properties securing the loans."  Also alleged is that Rood "falsely asserted that he had authority to accept payoff funds from various borrowers for loans assigned to SMCRT" and "[w]hen questioned about the status of certain loans, knowingly and intentionally misrepresented the loan status of those loans even though he knew certain loans had never closed, or had been paid off."  Plaintiffs also assert that Hepler, who has been characterized as Rood's right-hand man (Plaintiffs' Memorandum, 16), was also intimately involved in forging and falsifying documents.

        Several of the loan transactions said to be mired in the Defendants' fraudulent scheme were testified about at length by various witnesses and are well-documented within the volumes of trial exhibits.  The evidence produced demonstrates that Rood or Hepler made numerous fraudulent representations in connection with each of the following loans.

### The Davis Loan

        SMCRT accepted and funded a Mortgage Loan Purchase Commitment presented by Rood for a loan to Brian and Marcia Davis in the amount of $900,000.00.  The commitment was signed by Rood as Vice President of Mortgage American Bankers, a wholly-owned subsidiary of Kore, on April 14, 2006 (Pl. Ex. 216).  The commitment provided that the loan was to be secured by a second mortgage on the couple's property located in Washington, D.C.  As shown on the settlement statement (Pl. Ex. 217), $30,000.00 was to be held in escrow at Chevy Chase Bank.  Brian Davis testified that this escrow was intended to be a reserve so that payments on the second mortgage would be paid on time (Trial Tr., Brian Davis Test., 4/9/10, 132).  The $30,000.00 escrow was placed into the bank account of The Source, LLC (one of the Debtor Entities) (Pl. Ex. 219).  While Brian Davis never authorized this transfer to The Source, his business partner later wired an additional $41,250.00 into The Source's account.  This money was to be used to make future mortgage payments (Trial Tr., Brian Davis Test., 4/9/10, 133-134).  Davis testified that none of this money was, in fact, used to pay the second mortgage.  *Id*. at 134-135.  A supplement to the Plaintiffs' expert report prepared by Suzanne Hillman ("Ms.

Hillman") (hereinafter referred to as the "Hillman Report") (Pl. Ex. 214) traced the receipt and expenditure of the escrowed funds.[12]  SMCRT claims that it was further damaged as a result of fraudulent representations made by Rood in connection with the Davis loan because, prior to foreclosing on the property secured by this loan after Rood had reported it as delinquent, SMCRT gave the Davises credit for the $71,250.00 that Rood had appropriated.  SMCRT accepted an assignment of the Davis claim against Rood (Trial Tr., David Hillman Test., 4/14/10, 84).

### The Eastern Shore Loan

SMCRT and Rood signed a Mortgage Loan Purchase Commitment for a loan to Eastern Shore Design, Inc., in the amount of $500,00.00 on July 30, 2007 (Pl. Ex. 251).  Under the terms of this loan, 100% of the proceeds were to be escrowed, and Rood and Blue Horseshoe Capital were to be responsible for management of the escrow (Pl. Ex. 252).  SMCRT wired the funds to Aspen Title to purchase the Eastern Shore Loan on July 31, 2007.  Several months later, Hepler and Rood sent payoff letters in connection with this loan and Rood, holding himself out to be a "V.P. Lender Rep.," signed a Certificate of Satisfaction that was notarized by Hepler  (Pl. Ex. 267).  Rood never disclosed to SMCRT that the loan had been paid off, and, with the assistance of Hepler, he continued to report to SMCRT (via email) that monthly interest payments were being transmitted on the Eastern Shore Loan (Pl. Ex. 271-275).   The fraudulent nature of these statements is derived from the trial testimony of David Hillman ("Mr. Hillman"), the Chief Executive Officer of Southern Management Corporation and a trustee of SMCRT.  The court accepts Mr. Hillman's statement  that SMCRT had no knowledge of the payoff letters being sent and that Rood had no authority to sign documents, such as certificates of satisfaction, on SMCRT's behalf.  Mr. Hillman testified that the "only person that can release a mortgage owned by the Retirement Trust is myself or Ron Frank, the other trustee, and I have never authorized [Rood] or anyone else to release a mortgage on my behalf."  Trial Tr., David Hillman Test., 4/14/10, 104.   The record also demonstrates that Hepler falsified information pertaining to the

---

[12]  Referencing Pl. Ex. 463, Plaintiffs proved that Hepler sent Mallory a false statement that reflected reserve amounts of $56,250 for interest payments and a $239,000.00 construction reserve being held by a third-party attorney.  To the contrary, the statement signed by Mallory actually shows that no interest payments were made and that there were no reserve amounts.

Eastern Shore Loan for the Special Purpose Report prepared by Mallory (Pl. Ex. 278).

### The K Street Loan

This $500,000.00 loan to 1002 K Land Development, LLC was discussed in detail in the Hillman Report (Pl. Ex. 65). On September 12, 2007, SMCRT wired funds to Aspen Title Company to close the loan. The loan never closed. Approximately two months later, rather than return the money to SMCRT, Rood (through Hepler) directed Aspen to wire the money into the bank account of Blue Horseshoe Capital (Pl. Ex. 237). Rood followed up on his lie that the loan had closed and was performing "by providing to SMCRT monthly reports with transmittal of interest payments (allegedly from escrow) for the next 6 months from October 2007 through April 2008" (Hillman Report, 13-14). When he learned that the loan had never closed, David Hillman contacted Rood, who blamed it on "title issues" (Trial Tr., David Hillman Test., 4/14/10, 83). At trial, Ms. Hillman described the several exhibits demonstrating that Hepler and Rood knew early on that the loan was not going to close (Trial Tr., Suzanne Hillman Test., 4/15/10, 92-93). For example, an email dated September 12, 2007, from an individual at Aspen Title to Hepler and Hughes, informed them that "the seller is not in a position to sell the property" and that "[t]he contract is invalid." (Pl. Ex. 229).

### The Tseklenis/First Washington Loan

This $430,000.00 loan from Level One Capital Partners to First Washington Financial Corporation (a subsidiary of Kore) was guaranteed by Costa Tseklenis ("Tseklenis"), the father of the former Chief Executive Officer of Kore. The security for this loan was to be a second mortgage on property located in Oakhurst, California known as the "Lodge."[13] In connection with this loan, Hepler notarized a "Special Power of Attorney as to Real Property," pursuant to which Rood was appointed as attorney in fact for Tseklenis (Pl. Ex. 388). However, Tseklenis testified that he never appeared before the notary, Hepler (Trial Tr., Costa Tseklenis Test., 4/9/10, 43-44). SMCRT wired the funds to Cosmopolitan Real Estate Settlements, Inc., on June 15, 2006, and Hepler directed Cosmopolitan to disburse approximately $222,000.00 to Tseklenis and First Washington (Pl. Ex. 400). Besides the existence of a third lien on the Lodge (Pl. Ex.

---

[13] This property is listed as Kore's headquarters in its SEC filing (Trial Tr., Suzanne Hillman Test., 5/27/10, 26). *See* Kore Ex. 32.

386), contrary to the alleged security of a second position, no lien was ever recorded against that property to secure the loan. (Pl. Ex. 403; Trial Tr., Suzanne Hillman Test., 5/27/10, 23, 29). This fact was never disclosed to Mr. Hillman and, here again, the funds were not returned to SMCRT.

While Rood was silent as to the unsecured status of the Tseklenis/First Washington Loan, the court notes that "[f]raud may consist in a suppression of the truth as well as in the assertion of a falsehood." *Schnader v. Brooks*, 150 Md. 52, 132 A. 381, 383 (Md. 1926). *See Gourdine v. Crews*, 405 Md. 722, 759, 955 A.2d 769, 791 n.13 (2008) (the elements of an action based on fraudulent concealment of material facts are "1) the defendant owed a duty to the plaintiff to disclose a material fact; 2) the defendant failed to disclose that fact, 3) the defendant intended to deceive the plaintiff, 4) the plaintiff took action in justifiable reliance on the concealment, and 5) the plaintiff suffered damages as a result of the defendant's concealment") (*citing Green v. H & R Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039 (1999)).

Plaintiffs' evidence demonstrates that Rood and Hepler made numerous other false representations with respect to SMCRT loans. For example, while Rood and Hepler sent fraudulent payoff letters in connection with a $475,000.00 loan to Accom, LLC (the "Accom Loan") (Pl. Ex. 293 & 294), Rood continued to represent to SMCRT that loans made to 4106 Olympic and United D&P were active and performing when, in fact, the real properties said to secure these loans had been foreclosed upon by senior lenders (Trial Tr., David Hillman Test., 4/14/10, 129-130). There is also evidence that, with respect to the loan made to Defendant Hughes' mother for the remodeling of her house, the funds were "obtained with a fraudulent loan application that severely overstated her income." Trial Tr., Suzanne Hillman Test., 5/27/10, 56. *See also* Pl. Ex. 436. David Hillman testified that "there was no money in escrow. [The Hughes loan] was still on the books but it wasn't current. There was no money being paid on it." Trial Tr., David Hillman Test., 4/14/10, 109. But according to the statement prepared by Hepler and appended to the Special Purpose Review, the Hughes loan was represented as being active and performing (Pl. Ex. 463). Plaintiffs proved by clear and convincing evidence that Rood intentionally made material misrepresentations in furthering his fraudulent scheme. Rood asserts that "[t]he fact that SMCRT did not track the payments or have any review process is not the fault of the Debtor. There is no evidence of affirmative representations. Rather, there is evidence that the Debtor made payments per the terms of the loan." Proposed Findings of Fact

and Conclusions of Law Presented by Robert F. Rood, IV (hereinafter "Rood Memorandum"),
D.E. No. 549, 9. But Rood offered nothing to contradict the copious evidence offered by
Plaintiffs demonstrating that Rood made fraudulent representations about the performance of
various loans, signed fraudulent payoff letters and, in at least one situation, executed a fraudulent
certificate of satisfaction.

     As to Hepler, the analysis is slightly more complicated but ultimately the court reaches
the same conclusion. The false statements attributed to Hepler, proven by the Plaintiffs, include
falsified accounting statements in connection with certain loans and false information regarding
certain loans provided to Mallory in connection with Mallory's preparation of the Special
Purpose Review. Plaintiffs assert that Hepler communicated directly with borrowers, appraisers,
title agents and SMCRT (Plaintiffs' Memorandum, 17), whereas Hepler maintains that he never
provided information either directly to SMCRT or to an agent of SMCRT. Proposed Findings of
Fact and Conclusions of Law Presented by Nik Hepler (hereinafter "Hepler Memorandum," D.E.
No. 546, 6. Hepler also argues that he cannot be held liable for any false statements made
regarding loan figures and related items because he was merely doing his job and, furthermore,
did not have access to the data underlying those figures and therefore could not determine their
accuracy (Hepler Memorandum, 2-3). The fact that Hepler made these false statements in his
capacity as an employee of one of the Rood Entities[14] is of little importance. *See Tedrow v.
Deskin*, 265 Md. 546, 549, 290 A.2d 799, 802 (Md. 1972) ("corporate officers or agents are
personally liable for those torts which they personally commit, or which they inspire or
participate in, even though performed in the name of an artificial body."). *See also Dean v.
Beckley*, 2010 WL 3928650 at *2 (D. Md. October 1, 2010). Furthermore, given Hepler's

---

    [14]  Based on his deposition testimony, Hepler apparently did not know which Debtor
Entity was his actual employer. In response to being asked about which entity employed him,
Hepler stated, "I worked at Rugby. I couldn't tell you the entities under which I worked and in
what capacity they overlapped, but I just know I worked at Rugby." Pl. Ex. 493 , Nik Hepler
Dep., 1/19/10, 39. He further acknowledged that the "status of [his] employment was fluid, not
consistently from one entity or another was [he] paid, but [he] couldn't tell you with any
certainty at what period of time one entity paid me versus another." *Id.* at 54.

refusal to appear at trial, the evidence offered by the Plaintiffs of numerous false statements made by him, as well as the reasonable implications of Hepler's awareness of the falsity of these statements when he made them, are uncontradicted. The evidence produced by the Plaintiffs shows that Hepler, in addition to assisting in the preparation of fraudulent payoff letters, falsely represented to Mallory that certain loans (e.g., the Eastern Shore Loan and the Accom Loan) were performing loans despite the fact that he knew these loans had been paid off (Pl. Ex. 463, 517).

That these statements were made to Mallory, rather than to SMCRT, is also of little importance because Hepler knew that these statements were to be used by Mallory in preparation of the Special Purpose Review upon which SMCRT relied. The Special Purpose Review played an important role in perpetuating Defendants' fraudulent scheme. As David Hillman testified, he "relied on the [Special Purpose Report] for all of the loans that were outstanding and as a result of my reliance on that report, we lost another two months of time when we may have been able to get control of this situation sooner."(Trial Tr., David Hillman Test., 4/14/10, 129).

The court also notes that, as to Defendants Rood and Hepler, Plaintiffs have established the other necessary elements for fraud. SMCRT justifiably relied upon the loan applications presented, statements made, and representations made by Rood as to the securitization of property, the validity of the loan transactions, and the financial status of borrowers. Because many of these loans never closed, or were paid off without notice to or approval of SMCRT, and without transmission of the funds to it, SMCRT suffered significant damage. The court agrees with the Plaintiffs' assessment that reliance was justifiable given (1) SMCRT's background check of Rood, (2) the fact that Rood forwarded regular monthly interest payments on outstanding loans, and (3) information provided in the Special Purpose Review. *See* Pl. Exs. 36 & 54; Trial Tr., Suzanne Hillman Test., 4/14/10, 70-71, 77-78.

The Plaintiffs also pleaded a fraud claim against Jewell. However, his hand in many of the Defendants' fraudulent loans has been difficult for the court to discern. The fraudulent representations attributable to Jewell appear mainly in connection with the refinancing of loans made to Michelex Corporation that were sold to SMCRT in 2006. In March of 2007, Hepler emailed a "Commitment to Fund Term Sheet" to Thomas Gramuglia ("Gramuglia") for a $500,000 loan to Michelex that was to be guaranteed by Gramuglia (Pl. Ex. 301). Plaintiffs'

evidence showed that Rood falsely reported, for several months, that the funds advanced by SMCRT were being escrowed.  Shortly after SMCRT sent a demand letter directly to Gramuglia demanding payment in full, Kore (through Source Bio-Plastics) and Rood were trying to close a deal with Michelex and AGPRO.  Part of that deal involved the use of an "unencumbered asset."  This asset, however was one of the parcels of real property that had already been pledged by Gramuglia for the SMCRT loan.  Rood then executed a Mortgage Partial Release that released, without consideration, that property from the lien securing the SMCRT loan.  Consistent with Rood's course of conduct, SMCRT had no notice of the release (Pl. Ex. 317).  Rood also sent a fraudulent payoff letter to First American Title that resulted in the title company wiring $250,000.00 to Blue Horseshoe [Pl. Ex. 312].  Plaintiffs alleged that this money, unbeknowst to SMCRT, was then used to finance the Kore/Michelex/Wind Farm deal in New York.

Plaintiffs point to an email from Jewell to Rood as evidence that Jewell knew the $250,000.00 was used for the Michelex deal (Pl. Ex. 490).  Jewell testified that he was involved in trying to arrange an asset purchase between Source Bio-Plastics and a public company owned by Gramuglia, but denied having any knowledge about SMCRT's loan to Michelex (Trial Tr., 4/7/10, 95)].[15]  At the TRO hearing held on April 2, 2009, Jewell testified that he did not begin working on the Michelex loan until May 2008 (Hr'g Tr., D.E. No. 15, 100).

In addition to the Michelex loan, Plaintiffs also contend that Jewell was involved in the so-called "Woodbridge Loan" that actually involved two loans - one to Fusion Enterprises, Inc., and one to Old Dominion, LLC.   Jewell's involvement is said to be evidenced by an email from David Hillman that was sent to Rood and then forwarded to Jewell (Pl. Ex. 243).  At trial, Mr Hillman testified that, as to the Woodbridge loan, he "was aware that [Jewell] was working with [Rood]. I didn't know specifically what he was involved in but I was aware that he was around and he was an advisor and possibly a partner of Rood." Trial Tr., David Hillman Test., 4/14/10, 94.  Jewell, however maintains that he never spoke with Rood about the Woodbridge Loan. Trial Tr., Jewell Test., 4/9/10, 115.

_____

[15]  Plaintiffs showed that, after the proposed sale involving Source Bioplastics failed, Rood (on behalf of Arcadian, Inc., a wholly owned subsidiary of Kore) and Jewell (on behalf of his company, Jet Stream Voltage) signed a Memorandum of Understanding regarding the transfer of Kore's wind assets to Jet Stream.  *See* Pl. Ex. 50.

In his post-trial brief, Jewell argues that there is no evidence that he had direct communication with SMCRT or its loan committee, or that he was involved in any of the SMCRT loans (Proposed Findings of Fact and Conclusions of Law Presented by Charles Timothy Jewell (hereinafter "Jewell Memorandum"), D.E. No. 559, 2-3). Jewell further argues that, given his lack of direct contact with SMCRT, the Plaintiffs have no way of demonstrating that he made "an affirmative misrepresentation or any representation of any type or kind." Jewell Memorandum, 13. Jewell has maintained from the beginning that his business relationship with Rood effectively began in April 2008[16] and that he did not start working for Kore until late August/early September 2008. Trial Tr., Jewell Test., 4/7/10, 18-20. Given this timeline of events, he argues that he had no connection to any of the SMCRT loans (all of which were made well before then). At trial, when asked specifically about an email regarding the Gramuglia/Michelex/Source Bio-Plastics proposed transaction, he reiterated that he did not start working at the Rugby Avenue Office until April 2008, acknowledging only that he "had had discussions and looked into deals that [Rood] had sent over . . . as a summary of transactions that

---

[16] Jewell described his work history as follows: "2005 to – June of 2004 to January of 2007 I worked for Resource Bank. February of 2007, January or February of 2007 until April of 2008 or March, between March and April of 2008, I worked for TBN which is an LLC which outsources for Community First Bank. Since 2008 I had a relationship with Ameribank until it was seized and then I worked my pipeline from there. Since then I've been the COO of Kore and I've done consulting and other mortgage related work." [Trial Tr., Jewell Test., 4/14/10, 16-17]. In 2006, Rood and Jewell had been in negotiations about setting up a "net branch of some federally chartered bank", whereby they would submit loans to the bank and the bank would underwrite [*Id.*, 20]. Jewell testified that draft financial statements and draft cash flow reports were prepared but the proposed venture did not work out. *Id.*, 23. When Jewell decided to leave Community First Bank, he contacted Rood because he knew that there was space available in the Rugby Ave. Office out of which he could work. Jewell testified that he became interested in going to work for Kore because of its wind assets (Trial Tr., Jewell Test., 4/14/10, 31). He then described his role as COO in the following manner: "The main function that I wanted to do was obviously try to maximize any opportunities that the wind assets may have to create shareholder value. Also I wanted to find partners in the legal world and the accounting world that would help us bring Kore Holdings current on their filings which would also dramatically increase shareholder value I believe, and also look for a chief financial officer which would certainly help us when we had any investment opportunities. *Id.*, 51.

he had going on, but – and I actually forwarded those on to George Weast.[17]  I opened up the doors for the mortgage operations April 1." Trial Tr., Jewell Test., 4/9/10, 99.   When asked at trial about his knowledge of the Woodbridge Loan, and specifically about the email forwarded from Rood, Jewell stated that he had no recollection of Rood contacting him about this loan (Trial Tr., Jewell Test., 4/7/10, 132-133).[18]

Based on the evidence received, the court finds that Plaintiffs have not proven by clear and convincing evidence that Jewell made fraudulent statements in connection with any SMCRT loan.   While, as discussed below, the court senses that Jewell was involved in the fraudulent scheme concocted by the Defendants, there is insufficient evidence to show that Jewell had any direct communications with SMCRT or was a participant in the scheme.  Despite evidence that he played a role in the Michelex loan, the Plaintiffs have not proven that Jewell actually made any false representations to SMCRT in connection with that loan.  Indeed, Mr. Hillman testified that he had no interaction with Jewell at the time that the Michelex loan was made in June 2006. Trial Tr., David Hillman Test., 4/15/10, 19.

**<u>Pre-Petition Fraudulent Conveyances</u>**

The second aspect of Defendants' fraudulent scheme involved the diversion of loan proceeds through the bank accounts of Level One and Blue Horseshoe Portfolio[19] (the "Rood Entity Accounts") to themselves.  The Hillman Report offers the following description of the nature of these fraudulent transfers: "Rood additionally diverted principal repayments intended for SMCRT to his bank accounts without proper authorization.  The Debtor withdrew from the

---

[17]  George Weast has been described as Jewell's mentor (Trial Tr., Joseph Golden Test., 4/8/10, 109-110) and was also involved in the transaction between Kore and Jet Stream Voltage.

[18]  Note, however, that Jewell Ex. 1 is this same email but also includes the inflammatory reply that Jewell sent to Rood.

[19]  At trial, Suzanne Hillman testified that there were five bank accounts used by the Defendants in connection with these fraudulent transfers (Trial Tr., Suzanne Hillman Test., 4/15/10, 114).  Plaintiffs' Exhibit No. 352 is a summary statement of these five accounts, three of which are in the name of Level One and two of which are in the name of Blue Horseshoe Portfolio.

bank accounts that held these funds substantial payments to third parties that had no business purpose and which drained the Debtors' cash and resulted in a constant and continued state of insolvency for the Debtors" (P.3).    From the evidence produced, it is clear that Rood alone controlled the Rood Entity Accounts.  *See* Hillman Report, 3; Pl. Ex. 66 (Tr., TRO Hr'g, 4/2/09, 30); Trial Tr., Suzanne Hillman Test., 7/17/19, 20.

The Complaint pleaded a litany of examples of how Rood used the Rood Entity Accounts to fund a lavish lifestyle, as well as to "share[] 'gifts' of down payments, and indeed, complete auto purchases, for his co-conspirators." (Para. 76).   At the TRO hearing held on April 29, 2009, Rood testified that he did not maintain a personal banking account (D.E. No. 56, TRO Hr'g Tr., Robert F. Rood, IV Test., 112).  The Hillman Report concludes that "Rood regularly used the [five] Debtor Entity bank accounts to pay his various personal expenses including (but not limited to) the following: luxury vehicles and related accessories in the approximate amount of $331,093; rent for his personal residence in the amount of $165,130.66; meal and entertainment (including strip bars) of approximately $189,595; and clothing and jewelry of approximately $55,762." (P.12).  The Hillman Report also provides a breakdown of the amounts received by each participant:

| | |
|---|---|
| Kore | $1,375,129.55 |
| Rood | $6,022,423.66 |
| Jewell | $  116,318.61[20] |
| First Washington Equities, LLC | $  109,218.61 |
| Hughes | $  132,531.49[21] |
| Hepler | $  176,963.30[22] |

[11-12].  Of the individual Defendants, only Jewell denied receiving any portion of the money

---

[20]  In the supplemental report prepared by Suzanne Hillman (P.466), the total amount of funds paid to or on behalf of Jewell was revised upward to $166,035.02.

[21]  In the supplemental report prepared by Suzanne Hillman (Pl. Ex. 467), the total amount of funds paid to or on behalf of Hughes was revised upward to $178,838.05.  However, inasmuch as this amount includes a W-2 estimate of $42,000 (Trial Tr., Suzanne Hillman Test., 4/16/10, 15), Plaintiffs are only asserting damages against Hughes in the amount of $136,838.05 (Plaintiffs' Memorandum, 81).

[22]  In the supplemental report prepared by Suzanne Hillman (Pl. Ex. 468), the total amount of funds paid to or on behalf of Hepler was revised upward to $188,030.63.

said to have been transferred to him.  In his post-trial memorandum, Jewell asserts that he "has not received any payment, stock or other benefit from [Kore] or any Debtor" (Jewell Memorandum, 9).  His testimony at trial, however, paints a slightly different picture.  Jewell testified that he was due $5,000 per month in connection with his employment at Kore but never received this money, with the exception of small expense reimbursements  (Trial Tr., Jewell Test., 4/7/10, 18-20) and that he was promised, but never received, 500,000 shares of Kore stock when he took over as COO of Kore (Trial Tr., 4/7/10, 61).  With respect to the expense reimbursements, he testified that he never received more than $1,000 or $1,200 in any given month (Trial Tr., 4/7/10, 29).  Hillman prepared a supplement to her expert report (Pl. Ex. 466) that "lists every check that was written to Mr. Jewell as well as the expenses that ran through [FWE] since he had provided the affidavit that that was his entity." Trial Tr., Suzanne Hillman Test., 4/16/10, 12.

During the course of this case, Jewell changed his testimony numerous times regarding his ownership (or lack thereof) of FWE.  Jewell was listed as a managing member of FWE on a signed operating agreement dated December 1, 2006 (Pl. Ex. 211(a)).  According to that agreement, Jewell made a $10,000.00 capital contribution in exchange for a 100% interest in FWE.  Furthermore, Jewell signed an affidavit swearing that he was the owner of FWE (Pl. Ex. 131).  However, during the TRO hearing held over several days in April, 2009, Jewell denied having ownership interest in FWE  (TRO Hr'g Tr., 4/13/09, 19).  At trial, when questioned about a statement made during his Rule 2004 examination that he owned FWE,  Jewell replied that he thought he owned it (Trial Tr., Jewell Test., 4/7/10, 100-101).  The court gives no weight to Jewell's constantly changing testimony regarding the ownership of FWE.  Inasmuch as Jewell has failed to offer any evidence to refute the numbers set forth in the supplemental expert report or Plaintiffs' assertions that Jewell did, in fact, control the finances of FWE during the relevant time period, the court finds that Jewell is the recipient of those amounts set forth on the Hillman Report and the supplement thereto.

Plaintiffs' claim is under the Maryland Uniform Fraudulent Conveyance Act, which permits a transfer to be avoided if "either (1) the transfer was made with the actual intent to hinder, delay, or defraud a creditor (an actually fraudulent transfer); or (2) the debtor was insolvent and received less than reasonably equivalent value in exchange (a constructively

fraudulent transfer)." MD. CODE ANN., COM. LAW §§ 15-204-15-207.  *See* 11 U.S.C.
§ 548(a)(1).  Under Maryland law, the plaintiff must prove its claim by a preponderance of the
evidence.  *See In re Goldscheim*, 241 B.R. 370, 377-78 (BC Md. 1999).   Maryland courts rely
on badges of fraud as indicia for exposing fraudulent intent and establishing the knowledge
necessary for a fraudulent conveyance, such as insolvency or indebtedness of the transferor; lack
of consideration for the conveyance; a relationship between the transferor and the transferee; the
pendency or threat of litigation; secrecy/concealment; departure from the usual method of
business; transfer of the debtor's entire estate; reservation of benefit to the transferor; and the
retention by the debtor of actual possession of the property. *See, e.g., Wellcraft Marine Corp. v.
Roeder*, 314 Md. 186, 550 A.2d 377 (Md. 1988).  In *Berger v. Hi-Gear Tire & Auto*, 257 Md.
470, 263 A.2d 507 (Md. 1969), the court concluded that "where there is a concurrence of several
badges of fraud, an inference of fraud may be warranted."  *Id*. at 511.

Plaintiffs' case rests primarily on findings set out in the Hillman Report as amplified by
the wholly credible trial testimony of Suzanne Hillman.  She testified that the Debtor entities
have been insolvent since 2006 (Trial Tr., 4/16/10, 10-12).  The Hillman Report concludes that
(1) the Debtor Entities were insolvent by application of either the balance sheet test, the cash
flow test or the adequate capital test; (2) the Debtor Entities received less than a reasonably
equivalent value in exchange for each of the transfers; and (3) the transfers made by the Debtor
Entities to each of the Defendants were without fair consideration.  The Defendants offered no
evidence to establish that any of the Debtor Entities was, in fact, solvent during the relevant time
period.  Citing *Berger,* 257 Md. 470, 263 A.2d 507*,* and *In re Maryland Property Associates,
Inc.,* 309 Fed. Appx. 737, 744 (CA4 2009), Plaintiffs point out that the Debtor Entities'
insolvency is but one of many suspicious circumstances present here - others include the charges
brought against Chris Evans in the United States District Court for the District of Maryland in
connection with the Kore-JetStream Voltage transaction[23] and the lack of record-keeping by the
Debtor Entities. The Debtor Entities were used as nothing other than convenient devices for
Rood to shuffle money around to suit his purposes. Corporate formalities were totally ignored.

_____

[23] Evans pleaded guilty to conspiracy to commit wire fraud pursuant to a plea agreement.
See Pl. Ex. 199 & 200.

The Debtor Entities were useful to Rood by making his transactions more difficult to trace.  At all times, they were acting as Rood's agents, alter egos and instrumentalities for the perpetuation of his scheme.

These interrelationships between the corporate and individual Defendants created a convoluted web, making it nearly impossible to track the activity of any one person or entity. *See* Plaintiffs' Memorandum, Demonstrative Aid A.  The court concludes that with the exception of Hughes, the Defendants' main - if not sole - purpose in conducting their business affairs in this manner was to conceal their fraudulent scheme.  The lengths to which the Defendants went to conceal the nature of their activities is highlighted by the largely fictitious Special Purpose Review that they commissioned Mallory to prepare with the 'assistance' of Rood and Hepler.  Rood, who controlled the Debtor Entities and therefore effectuated the fraudulent transfers, was the primary beneficiary of this scheme.  Because of the numerous badges of fraud present here, the court finds that a presumption of fraudulent intent exists.  *See Kelly v. Armstrong*, 141 F.3d 799, 802 (CA8 1998) ("Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent").

With the shifting of the burden of proof,  Defendants must prove fair consideration.  *See Kline v. Inland Rubber Corp.*, 194 Md. 122, 138, 69 A.2d 774, 780 (Md. 1949); *A.V. Laurins & Co., Inc. v. Prince George's Cnty.*, 46 Md. App. 548, 420 A.2d 982 (1980).  Hepler argues that the only money he received from the Debtor Entities was his wages and that, "[a]s long as the employees were being paid their agreed upon (and therefore reasonable) wages, the trustee may not disgorge employees, servants, or agents of their earned wage."  *See* Hepler Memorandum, 15.  Hughes put forth a similar argument in his post-trial memorandum, asserting that "[t]he Plaintiffs' evidence simply shows that [he] was paid for services rendered.  Indeed, most of the services were performed for Level One to make sure that the collateral of SMCRT was being preserved." Proposed Findings of Fact and Conclusions of Law Presented by Warren Hughes (hereinafter "Hughes Memorandum"), D.E. No. 547, 3.  As noted, however, Hepler did not know which Debtor Entity employed him.  *See infra*, note 12.  Hughes testified that he performed work for SMCRT through X Factor Trash and Transport, which provided eviction services for SMCRT's properties in Prince George's County, Baltimore County, and Baltimore City (Trial Tr., Hughes Test., 5/28/10, 8-9).  Hughes also stated that he was compensated by Rood but did

not know from which account he was paid. *Id.*, 10, 15.  Neither Hepler nor Hughes provided any evidence regarding his salary or employment agreement (if any existed).  Hughes admits that there are no tax records, W-2s or 1099s to show that these payments were, in fact, proper compensation (Pl. Ex. 70, TRO Hr'g Tr., 4/30/09, 70).  The court therefore cannot find any credible evidence that the money paid to either Hughes or Hepler was reasonable compensation for the services rendered to the party paying them.

Plaintiffs have asserted damages against Kore in connection with the sale of wind-related assets to Jewell's company, JetStream Voltage ("JetStream").  They argue that after the proposed sale of Kore's wind assets to Michelex fell through, "Jewell, Hepler and Rood then proceeded to strip Kore's assets and moved them into another entity [JetStream]." Plaintiffs' Memorandum, 8.  They point to documents filed in the case that was brought by the U.S. Attorney's Office against Christopher Evans, an attorney who worked with Jewell in connection with the formation of JetStream,[24] in the United States District Court for the Eastern District of Virginia, as evidence of Rood and Jewell's involvement in that transaction.  The Criminal Information (Pl. Ex. 199) set forth the following facts:

* * *

2. Kore Holdings, Inc., was an inactive public company controlled by an individual referred to herein as D1.

3. Jetstream Voltage, Inc. (hereinafter "Jetstream"), was formed in late December 2008, by the defendant EVANS at the request of D1 and an individual referred to herein as D2. It was defendant EVANS' understanding that Jetstream's president was D2.

4. With the formation of Jetstream, D1 and D2 promised the defendant EVANS that he would receive five percent of Jetstream stock.

* * *

7. Beginning in early January 2009 ... the defendant,

CHRISTOPHER M. EVANS,

D1 and D2 did unlawfully and knowingly combine, conspire, confederate with each other to commit offenses against the United States, specifically: having devised a scheme and artifice to defraud potential investors who might loan money to

---

[24] *See* TRO Hearing Tr., Christopher Evans Test., 4/13/09, 53-62 (D.E. No. 29) and  ftn. 23.

Jetstream, to transmit and cause to be transmitted by means of wire communications in interstate commerce certain signs, signals, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343

\* \* \*

8. During the month of January 2009, in return for the promise of receiving five percent of Jetstream stock, the defendant EVANS agreed with D1 and D2 to assist them in an effort to solicit debt financing for Jetstream based upon false and misleading representations.

9. As part of the scheme to defraud potential investors, D1 and D2 planned to mislead the McLean Group about the value of Jetstream's assets, in particular, the value of a wind farm lease in California which Jetstream had ostensibly received from Kore Holdings, in return for Jetstream stock. In fact, the wind farm lease had been inactive for several years.

## Civil Conspiracy

Plaintiffs allege that Rood, Jewell, Hepler and Hughes, in their individual capacities and during the course of their employment and tenure as officers, employees, stockholders, and/or insiders of Kore, conspired with one another to perpetuate the fraudulent scheme against SMCRT detailed above.  Under Maryland law, civil conspiracy is defined as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 385 Md. 1, 24, 867 A.2d 276, 290 (2005).  *See also Superior Bank v. Tandem Nat'l Mortg.*, 197 F. Supp. 2d 298 (D. Md. 2000).  But, under Maryland law, "'conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 916 A.2d 257 (Md. 2007) (quoting *Alleco Inc. v. Harry & Jeannette Weinberg Found., Inc.*, 340 Md. 176, 189, 665 A.2d 1038, 1045 (Md. 1995)).  Here, the various email communications between the individual Defendants clearly establishes "a meeting of the minds in an unlawful arrangement."  *Electronics Store, Inc. v. Cellco P'ship*, 732 A.2d 980, 127 Md. App. 385 (1999).  Moreover, inasmuch as the court has concluded that Rood and Hepler made numerous fraudulent misrepresentations and that Rood was involved in the fraudulent pre-petition transfers, Plaintiffs thus established the required

tortious conduct on the part of said individuals.

Defendants argue that a conspiracy cannot occur between a corporation and its agents acting within the scope of their employment. *Fraidin v. Weitzman*, 93 Md. App. 168, 235, 611 A.2d 1046, 1079 (1992) ("A person's acts will be deemed within the scope of employment when they are taken in furtherance of the business of the employer and are authorized by the employer.") *Brown v. Mayor and City Council*, 892 A.2d 1173, 1183, 167 Md. App. 306, 323 (2006). Hepler asserts that "a review of the evidence . . . will show nothing other than the fact that [Hepler] did his job. There is no testimony or evidence, even from the Plaintiff's expert [Hillman], that [Hepler] knew either where the money came from in this matter or the items behind the numbers. There was no testimony or evidence that [Hepler] had access to records or other data that would suggest or indicate that any email or dissemination of information occurred with malice or a reckless disregard for the truth." Hepler Memorandum, D.E. No. 546, 2-3. The Defendants argue that the corporate Defendants are all of affiliates or subsidiaries of Kore and therefore cannot conspire with one another. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 104 S. Ct. 2731 (1984) (holding that a parent and its wholly owned subsidiary are legally incapable of conspiring with one another). *See also Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (CA4 1991).

Plaintiffs' response to this argument based upon the intracorporate immunity doctrine is found in their consolidated rebuttal to Defendants' memoranda (D.E. No. 551) (hereinafter "Plaintiffs' Rebuttal"), stating that an exception exists where the officer or agent has an independent personal stake in achieving the corporation's illegal objectives. *See Eplus Tech., Inc. v. Aboud*, 313 F.3d 166, 170 (CA4 2002); *Shoregood Water Co., Inc. v. U.S. Bottling Co.*, 2009 WL 2461689 (D. Md. Aug. 10, 2009); *Detrick v. Panaplina, Inc*., 108 F.3d 529, 544 (CA4 1997). Based on the court's conclusions that Rood, Hepler, and Jewell were the beneficiaries of the transfers of the diverted SMCRT loan proceeds, the court finds that each of them had a stake in ensuring the success of this scheme.

Plaintiffs also seek to fasten liability on Hepler and Jewell based upon aider and abettor liability. To establish a claim for aiding and abettting, a plaintiff must establish that (1) there is a violation of the law by the principal, (2) defendant knew about the violation, and (3) the defendant gave substantial assistance or encouragement to the principal to engage in the tortious

conduct.  *See Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc*., 340 Md. 176, 665 A.2d 1038 (Md. 1995); *Christian v. Minn. Mining & Mfg. Co.*, 126 F. Supp. 2d 951, 960 (D. Md. 2001).  Plaintiffs contend that Hepler, for example, contributed false information to the Special Purpose Review, whereas Jewell can be found liable under this theory due to his work in connection with the Michelex transactions as early as March 2008 (Plaintiffs' Memorandum, 57).  Hepler, citing *Bloor v. Carro*, *Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (CA2 1985), asserts that Plaintiffs have not proven the necessary elements to establish aiding and abetting, namely that he had actual knowledge of any sort of alleged fraudulent scheme. Plaintiffs assert that Rood orchestrated the scheme to defraud SMCRT and that both Hepler and Jewell knew about the scheme and gave substantial assistance in its perpetration (Plaintiffs' Rebuttal, 5).  The evidence presented conclusively shows that Rood was the principal mover of this scheme.  He was involved in every single loan caught up in Defendants' web of deceit, and the beneficiaries of the fraudulent transfer of diverted SMCRT loan proceeds were himself and his cronies.  Moreover, Plaintiffs have offered substantial evidence of Hepler's involvement in the preparation of various fraudulent loan documents, and the court is not persuaded by his repeated assertions that he was merely doing his job and had no idea of the fraudulent nature of Rood's business.

Jewell maintained that "he has never done a business transaction with Rood prior to April 1, 2008" (Plaintiffs' Memorandum, 46).  Plaintiffs' evidence showed the existence of a business relationship prior to that time.  *See* Pl. Ex. 30 (evidencing an award of 750,000 shares of Kore stock to Jewell on April 17, 2006) and Pl. Ex. 11 (a Memorandum of Understanding created by Jewell for FWE in October 2006).   Moreover, Jewell worked for TBN, which was under contract with Community First Bank, an entity whose payroll was paid from the bank accounts of Level One and FWE (Pl. Ex. 460(a)).  Through the evidence presented at trial, the court has been able to glean the extent of Jewell's involvement in Rood's scheme and, particularly with respect to the Michelex transaction, the court finds that Jewell provided Rood with substantial assistance in this scheme.  *See Purdum v. Edwards*, 155 Md. 178, 141 A. 550 (Md. 1927) ("'[w]hen several participate, they may do so in different ways at different times, and in very unequal proportions.  One may plan, another may procure the men to execute, others may be the actual instruments in accomplishing the mischief, but the legal blame will rest upon all.'")

(Citation omitted.)

**Unauthorized Post-Petition Transfers of Assets**

The Complaint charges that, in the weeks following the bankruptcy filing, the Defendants continued "their high living and efforts to evade the law" (Compl. ¶ 88) and "their brazen efforts to funnel funds and assets into newly formed entities" (¶ 109), namely Source Bio-Plastics, Inc., and New Summit Enterprises, LLC.  Rood began the process of transferring assets within days of filing his bankruptcy petition (TRO Hearing Tr., Suzanne Hillman Test., 7/15/09, 18).   At trial, Hillman testified that "immediately upon filing for bankruptcy, [Rood's] cash withdrawals went from roughly $20,000 a month to as high as $44,000 in August [2008] . . . .  There is a dramatic change in behavior even though he still had use of all the debit cards."  Trial Tr., Suzanne Hillman Test., 7/17/10, 29.  By the time the 341 meeting was concluded on August 26, 2008, most of the post-petition transfers cited by Plaintiffs had already occurred.  The following is a list of post-petition deposits of funds traced to bank accounts controlled by Rood, as set forth on Demonstrative Aid G appended to the Plaintiffs' Memorandum:

| | |
|---|---|
| Blue Horseshoe Portfolio | $    330.67 |
| X-Factor Extermination LLC | $17,295.00 |
| FWE | $64,764.57 |
| The Source, LLC | $49,329.08 |
| Kore | $48,654.90 |
| Deed of Trust - Nanjemoy | $50,000.00 |
| Kore - Preferred Stock | unknown |

**Total: $230,742.22**

*See also* Trial Tr., Suzanne Hillman Test., 7/17/10, 28.  In addition to those transfers listed on Demonstrative Aid G,  Ms. Hillman also testified as to a $3,000 post-petition payment received by Jewell (Trial Tr., 4/16/10, 72).

This claim is governed by Section 549 of the Bankruptcy Code:

**11 U.S.C § 549. Postpetition transactions**

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate –
(1) that occurs after the commencement of the case; and

*       *       *       *

(2)(B) that is not authorized under this title or by the court.

As explained in the case of *In re Merry-Go-Round Enters., Inc.*, 400 F.3d 219 (CA4 2005):

> "As recognized by the bankruptcy and district court, the recovery by a Trustee of post-petition transfers from the bankruptcy estate requires ... the satisfaction of four elements: (1) a transfer, (2) of property of the estate, (3) made after the commencement of the case, and (4) that is not authorized under the Bankruptcy Code or by the bankruptcy court."

*Id.* at 224. Once a transfer is established, "the burden of proving the validity of the transfer rests with the defendants." *See In re Allen*, 217 B.R. 952 (BC M.D. Fla. 1998). *See also* Fed. R. Bankr. P. 6001 ("Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof."). The court finds that Plaintiffs fail to state a claim under Section 549(a) because they have not established that the funds detailed above were actually transferred to another entity or individual. Under the Bankruptcy Code, the term "transfer" is defined as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." 11 U.S.C. § 101(54). The recipients of the funds were either entities controlled by Rood or Defendants in this adversary proceeding. It therefore cannot be said that the Defendants ever disposed of or parted with these funds. Moreover, with respect to those "transfers" that were actually deposits of funds into accounts controlled by Rood, the court observes that "an ordinary deposit in a bank . . . is not a 'transfer.'" *Citizens Nat'l Bank of Gastonia, N.C. v. Lineberger*, 45 F.2d 522, 527 (CA4 1930). A deposit of funds "is not a sale or parting with property" because the funds are "withdrawable at the will of the depositor." *Bank of Commerce & Trusts v. Hatcher*, 50 F.2d 719, 720 (CA4 1931).

### Turnover

Plaintiffs seek turnover of the funds transferred to the Defendants pursuant to Section 542(a) of the Bankruptcy Code, that provides:

### 11 U.S.C. § 542. Turnover of property to the estate

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under

Page -27-

section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Plaintiffs assert that during the case Defendants exercised dominion and control over property of the bankruptcy estates of Rood and the Debtor Entities in an unauthorized and wrongful manner, thereby infringing upon the Trustee's right to control and use the assets and barring SMCRT and other creditors from access to property (including loan proceeds) that rightfully belongs to them.

Plaintiffs rely heavily upon bank records, checks and other documentation to show that the funds diverted from SMCRT were deposited into the accounts of the Defendants. "'The primary condition of relief [by turnover] is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so.'" *Hager v. Gibson*, 109 F.3d 201 (CA4 1997) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 63, 68 S. Ct. 401, 405 (1948)). The Trustee, however, must "demonstrate by clear and convincing evidence that the assets in question are part of the bankrupt's estate." *In re Himes*, 179 B.R. 279, 282 (BC E.D. Okla. 1995). The Hillman Report (and the supplements thereto), as well as the testimony of Suzanne Hillman, establish that the various transfers of funds to the Defendants could be traced to one of the five bank accounts controlled by Rood through the various Debtor Entities. The Defendants have not sought to challenge this contention. Having concluded that Defendants had possession of funds that are property of the bankruptcy estates of Rood and the Debtor Entities, the court finds that these funds are subject to turnover, provided that they still exist and can be located. The plain meaning of "during the case" and "shall recover" is that "liability may be predicated upon possession 'during the case,' not just at the time the order is entered. The trustee is not limited to recovering specific property or its proceeds. Instead, the trustee is also given the ability to recover 'the value of such property.'" *In re USA Diversified Prods., Co.*, 193 B.R. 868, 878 (BC.N.D.Ind.1995). *See also*, *In re Robertson,* 105 B.R. 440, 457 (BC N.D.Ill.1989). Defendants cannot equate "the absence of present possession with the absence of liability, as this would require the court to disregard the language of section 542(a) which makes the statute applicable to anyone who possessed property of the estate during the case and gives the trustee the ability to recover the value of such property." *Diversified Products*, 193 B.R. at 878.

**Accounting**

Plaintiffs assert that the Trustee should be provided an accounting for all income received and expenditures made between May 1, 2006 and the date of any judgment entered by the court. Maryland law recognizes a common law right of accounting in a court of equity. *Cook v. Hollyday*, 186 Md. 42, 45 A.2d 768 (1946). However, accounting is an equitable remedy and, as with all such remedies, requires the absence of an adequate remedy at law. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478, 82 S. Ct. 894, 900 (1962) ("[T]he plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them"). *See generally, Alternatives Unltd, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 510, 843 A.2d 252, 307-308 (2004). Here, the Plaintiffs have quantified the amount of each of the Defendants' liability and the court will enter a judgment against each of the Defendants. Therefore, Plaintiffs have an adequate remedy at law. *See In re Bonds Distributing Co.*, Inc., 2000 WL 33682815, at *13 (BC M.D. N.C. November 15, 2000) ("[I]f the plaintiff obtains the monetary judgment he alleges he is entitled to, and the judgment is collectible then no further relief will be needed. If the judgment is not collectible because neither defendant has any assets, then an accounting would be pointless").

**Injunctive Relief**

As set forth in the Plaintiffs' Rebuttal, Plaintiffs request a permanent injunction for the limited purpose of prohibiting "Rood and Jewell from exercising further control or exercising any voting rights in Kore and its subsidiaries" (P.19). Plaintiff asserts that "because Kore is now a Chapter 7 debtor in this Court . . . any injunctive relief preventing its officers and directors from removing books and records of the debtor and dissipating assets of the debtor simply prohibit Rood and Jewell from conduct already prohibited by the Bankruptcy Code" (P.20). In Kore's bankruptcy case, however, Rood and Jewell each filed a request to be released from obligations related to Kore because both had resigned as an officer and director of Kore (D.E. Nos. 79, 82). In light of this development, and the fact that a Chapter 7 trustee is serving in the case, the court finds Plaintiffs' request for injunctive relief to be moot.

**Declaratory Judgment (Alter Ego)**

Because of the relief available to Plaintiffs under the other counts, the court finds that the Plaintiffs' request for a declaratory judgment is redundant and will not separately deal with this count.

**Damages**

**A.  Count I (Fraud) and Count III (Conspiracy)**

Plaintiffs seek, "[a]s to Kore and each of its subsidiaries, Jewell, Hepler, FWE, and Rood," a joint and several judgment for compensatory damages of $5.8 million and punitive damages of $10,000,000.00."  "The objective of an award of compensatory damages is to make the plaintiff whole by monetary compensation."  *Exxon Corp. v. Yarema*, 69 Md. App. 124, 137, 516 A.2d 990, 997 (1986), *cert denied*, 522 A.2d 392 (1987).  A joint and several judgment is appropriate when, as is the case here, the harm caused is indivisible between defendants.  *See United States v. Monsanto*, 858 F.2d 160, 171-72 (CA4 1988).  *See also Faison v. Nationwide Mortg. Corp.,* 839 F.2d 680, 686 (CA D.C. 1988).  A bankruptcy trustee "may recover only once from multiple transferees in multilateral fraudulent conveyances," but cannot recover the full amount from each defendant to receive duplicate recovery.  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (CA2 1995) (*citing* Robert J. White, *Leveraged Buyouts & Fraudulent Conveyance Law Under the Bankruptcy Code*, 1991 Ann. Surv. Am. L. 357, 410-11 (1992)).  Because there are multiple defendants, "any amount paid by anybody . . . for and on account of any injury or damage, should be held for a credit on the total recovery in any action for the same injury or damages" to prevent the plaintiff from recovering multiple times from the same harm.  *Sun Chems. Trading Corp. v. SGS Control Servs., Inc.,* 159 Fed. Appx. 459, 462 (CA4 2005) *(quoting Holland v. S. Pub. Utils. Co., Inc.,* 208 N.C. 289, 292, 180 S.E. 592, 593-94 (1935)).  Moreover, the court notes that the Plaintiffs' recovery from Rood in the prior case (AP No. 09-00058) should be credited and thus damages in this case are not an additional recovery but rather are co-extensive with that judgment.  The plaintiff is not entitled to double recovery for the same injury. *Gordon v. Pete's Auto Serv. of Denbigh, Inc.,* 637 F.3d 454, 460 ("There is a widely accepted prohibition on duplicative damages.").  *See HBE Leasing Corp.*, 48 F.3d at 640; *Pacific Fuel Co., LLC v. Shell Oil Co.,* 2011 WL 676898,  at *2 (CA9 2011) (holding that, because plaintiff's claims were

"presented as a single claim, based on the same facts, and based on the same alleged damages,"
multiple awards would be duplicative).  *Cf. Seligman v. Tenzer,* 173 Fed. Appx. 280, 283 (CA4
2006) (holding that because there was no distinction between the damages caused by actions of
defendants in a prior case and actions of the defendant in this case, the plaintiff suffered a "single
indivisible injury" allowing for one cause of action).

The compensatory damages award sought is based upon the damages incurred by
SMCRT in connection with each of the following loan transactions:

> Davis Loan - $71,250.00
> First Washington/Tseklenis Loan - $430,000.00
> Eastern Shore Loan - $500,000.00
> Accom Loan - $484,500.00
> Michelex/Gramuglia Loan - $500,000.00
> K Street Loan - $500,000.00
> Woodbridge Loan  - $1,000,000.00
> Hughes Loan - $150,000.00
> 4106 Olympic and United D&P Loans: $806,000.00
> 1620 E Street and AWS Capital Investment Loans - $900,000.00
> Yonkus Loan - $500,000.00
> **Total: $5,841,750.00**

Rood and Hepler made fraudulent statements in connection with a number of the SMCRT
loans.  In her testimony about the calculation of fraud damages, Ms. Hillman took into account
the fact that Hepler prepared loan instructions, prepared monthly statements of interest that were
transmitted to SMCRT, and "clearly knew that the money was being used for other purposes
than for the borrowers." Trial Tr., Hillman Test., 4/16/10, 19.  Plaintiffs established that both
Rood and Hepler made fraudulent representations in connection with the Eastern Shore Loan, the
K Street Loan, the Tseklenis/First Washington Loan, the Accom Loan, the Michelex/Gramuglia
Loan, the Hughes Loan and the Woodbridge Loan.   Plaintiffs also established that Rood made
fraudulent representations in connection with the Davis Loan and the 4106 Olympic and United
D&P Loans.   The court, however, finds that the Plaintiffs have not proven that either Hepler or
Rood made any fraudulent representations with respect to the 1620 E Street and AWS Capital
Investment Loans or the Yonkus Loan.  While Ms. Hillman's testimony supports a conclusion
that  SMCRT incurred losses in connection with the latter loans (Trial Tr., 4/15/10, 130-131),

nothing was offered in evidence to show that these losses were the result of false representations made by Rood or any of the other Defendants. Based on the foregoing, the court will grant Plaintiffs a joint and several compensatory damages award against Rood and Hepler in the amount of $4,441,750.00. Jewell's liability is based upon the court's finding that he conspired with Rood and Hepler to perpetuate fraud against SMCRT. The evidence presented at trial, however, only connected him to the Michelex/Gramuglia Loan. Trial Tr., Test. of Suzanne Hillman, 4/16/10, 20-22. As such, the court will grant Plaintiffs a compensatory damages award against Jewell in the amount of $500,000.00.

Plaintiffs' complaint also seeks Ten Million Dollars ($10,000,000.00) in punitive damages. "In order to justify the award of punitive damages ... [the] Court must find the presence of actual malice in the conduct of the defendants, described by the Maryland Court of Appeals as "'evil motive, intent to injure, ill will, or fraud.'" *In re Freeland*, 360 B.R. 108, 130 (BC Md. 2006) (quoting *Owens-Illinois v. Zenobia*, 325 Md. 420, 452, 601 A.2d 633, 642 (1992)). The court has found that the Defendants, other than Hughes, engaged in fraudulent conduct justifying punitive damages. Nevertheless, having observed the individual Defendants, the court would be surprised if any one of them will make any meaningful payment of the compensatory damages award. The court finds that the fixing of a large amount of punitive damages is a useless act, but the court will award nominal punitive damages of $1 as to each Defendant other than Hughes. *Cf. Jordan v. Moore*, 2010 WL 997065 (D. Md. Mar. 16, 2010); *Khalifa v. Shannon*, 404 Md. 107, 143-144, 945 A.2d 1244 (2008).


**B. Count VIII (Fraudulent Conveyance of Corporate Assets for No Consideration)**

Inasmuch as the court finds that the loan proceeds were fraudulently diverted to the

Defendants, the court must then make a determination as to the dollar amount to be recovered by the Plaintiffs. During trial, Plaintiffs' counsel assured the court that he would explain the bases for his damage calculation in his post-trial memorandum. *See*, *e.g*., Trial Tr., 5/27/10, 24. The court, however, finds that Plaintiffs' Memorandum is not helpful in shedding light on why a particular Defendant was deemed to be the transferee of a certain conveyance.

As to this count, Plaintiffs seek a judgment against Rood for damages in the amount of $6,022,423.66. This figure is derived from Exhibit 3 of the Hillman Report that is entitled "Summary of LO/BH gross funds that were used to pay the following expenses for or on behalf of Robert F. Rood, IV For the Period 01/01/2006-7/14/2008." Personal expenses are broken down into three broad categories: cash withdrawals; restaurant, entertainment and travel; and other personal expenses. These expenses total approximately $1,017,393.33. No evidence was introduced by Rood to challenge the legitimacy of the figures provided by Hillman.[25] The court finds Ms. Hillman's testimony to be wholly credible and persuasive, and the court accepts her calculations as conclusive as to the amount of money Rood personally received as a result of his fraudulent scheme.

The remainder of the claim asserted against Rood is based upon expenditures made on behalf of "other business entities associated with [Rood]" as well as on behalf of Kore, Jewell, FWE,

---

[25] The court acknowledges that even uncontradicted expert testimony is not conclusive. *See Security-First Nat'l Bank of L.A. v. Lutz*, 322 F.2d 348, 355 (CA 1963) (expert testimony is not conclusive upon the trier of fact even though uncontradicted but trier of fact may not act arbitrarily in disregarding uncontradicted testimony of witnesses whose qualifications and judgment have not been discredited); *In re Villas at Hacienda Del Sol, Inc*., 364 B.R. 702, 710 (BC D. Ariz. 2007) (court not required to accept testimony simply because it is the only testimony in the record: it still must be credible).

Rood's parents, Hughes and Hepler. Here, the Plaintiffs have failed to explain why expenses paid on behalf of these other individuals and entities should be deemed to be expenditures made by Rood. Accordingly, the court will not include these expenditures in its damages calculations. For that reason, as to Count VIII, the court will enter judgment in the amount of $1,017,393.33 - representing all charges categorized as "total personal expenses paid to or on behalf of Robert F. Rood, IV" - against Rood in favor of the Trustee.

Plaintiffs seeks judgment against Jewell for damages in the amount of $166,035.02 (Pl. Ex. 466). At trial, Ms. Hillman testified that this figure was derived from checks written to Jewell "as well as the expenses that ran through [FWE] since [Jewell] had provided the affidavit that he was the entity" (Trial Test., 4/16/10, 12-13). It appears that four payments were made directly to Jewell, in the total amount of $7,100. *See* Pl. Ex. 466; Trial Tr., 5/27/11, 61. As for the expenses that were paid out of the FWE account, the court does not find that these expenses can be attributed to Jewell, inasmuch as Ms. Hillman testified that Rood alone had control over the FWE account and Plaintiffs have not introduced sufficient evidence in support of their claim that these expenses were made by or on behalf of Jewell (Trial Tr., Hillman Test., 7/15/10, 19).

Jewell's income from Pearl Management, LLC, based upon his 2007 W-2 and his estimated income from Pearl Management in 2008, is also included in this amount. Ms. Hillman testified that she included this income because the "Pearl Management payroll was paid by Level One Blue Horseshoe and I know of no discernible benefit that Level One Blue Horseshoe received for any payment of that payroll" (Trial Tr., 5/27/10, 39-40). When asked if she had any payroll records that actually associated Jewell with Pearl Management, however, Ms. Hillman testified that she had requested those records from Rood and Jewell but never received a "full copy." (Trial Tr., 5/27/10, 42). Ms. Hillman also testified that she knew "Pearl Management, Kore

Page -34-

Holdings and Community First Bank had some type of agreement" but she could not "explain the entire relationship." Trial Tr., 7/15/10, 38-54. This statement, without anything to support it, is not enough to connect the dots between Jewell, Level One Blue Horseshoe, and Pearl Management. Therefore, these amounts will not be included in any damage award against Jewell.

Plaintiffs seek an additional damages award against Jewell in connection with payroll expenses in the amount of $587,263.46 (Pl. Ex. 460(a). At trial, Ms. Hillman characterized these transactions, which involved payments to various entities (including Community First Bank, Winters LLC and Kore) as being made for Jewell's benefit. This conclusion was based upon the fact that Ms. Hillman did not believe there was any "income coming into the Level One Blue Horseshoe bank accounts related to these expenses" (Trial Tr., Hillman Test., 4/16/10, 14). Again, the court does not find that the Plaintiffs satisfactorily explained why payments made to those entities should be deemed to be payments made to Jewell. Therefore, the court will only enter a judgment on this Count in the amount of $7,100 against Jewell in favor of the Trustee.

Plaintiffs' claim for damages against Hepler in the amount of $188,030.63 (Pl. Ex. 468) was broken down as follows: "105,000 are monies that he received off payroll as well as the purchase of a Mercedes which was checks or wires from the Level One Blue Horseshoe bank account. The W-2 is his actual W-2 for 2006 which was from Pearl Management LLC which was paid in its entirety from the Level One Blue Horseshoe bank accounts. For 2007 again it's his actual W-2, again paid through its entirety from Level One Blue Horseshoe. 2008, I took that fraction through May based on the number of payrolls I saw running through Level One Blue Horseshoe bank accounts" (Trial Tr., Hillman Test., 4/16/10, 16-17). Ms. Hillman testified that Hepler should repay all of his W-2 income because of his role in Rood's fraudulent scheme. Trial Tr., 5/27/10, 57-58. However, as Defendants' former counsel pointed out, there is no evidence that Hepler did not perform services for Level One Blue Horseshoe. Furthermore, in reviewing Pl. Ex. 468, the court finds that the Plaintiffs did not adequately explain why Hepler should be liable for payments to Euro Motorcars or Reginald Borrow. The court therefore will enter a judgment of $94,800.00 against Hepler in favor of the Trustee.

As to Hughes, Plaintiffs seek a judgment for damages in the amount of $178,838.05 (Pl. Ex. 467). This figure is based upon actual disbursements made to him and his estimated earnings in 2006. Trial Tr., Hillman Test., 4/16/10, 15. Ms. Hillman testified that "Hughes was no longer on

the payroll after early 2006.  All he received are direct payments out of [Level One Blue Horseshoe]."  Trial Tr., 7/15/10.  In reviewing Pl. Ex. 467, the court finds that the Plaintiffs did not adequately explain why Hughes should be liable for money wired to Ocwen Financial and Pact Investments, as well as checks made out to Millenium Development Corporation and Public Storage.  Accordingly, the court will enter a judgment of $115,820.41 against Hughes in favor of the Trustee.

The foregoing constitutes the court's findings of fact and conclusions of law. Counsel for the Plaintiffs shall submit a proposed order on notice.

cc:

<u>SERVICE LIST</u>

Gary A. Rosen, Chapter 7 Trustee
c/o Nelson Cohen, Esq.
Zuckerman Spaeder LLP
1800 M Streeet, NW
Washington DC 20036

Southern Management Corporation Retirement Trust
c/o Paul Sweeney, Esq.
2530 Riva Road, Suite 400
Annapolis MD 21401

Robert F. Rood, IV
10800 Balantre Lane
Potomac MD 20854

Robert F. Rood, IV
6 Sabal Island Drive
Coral Gables FL 33134

Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

Kore Holdings, Inc.
c/o Marc S. Koplik, Esq.
420 Lexington Avenue, Suite 2831
New York NY 10170

Arcadian, Inc.
c/o Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

First Washington Financial
c/o Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

Level One Mortgage Capital
c/o Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

Mortgage America Bankers
c/o Kaptain Koontz
2110 Darcy Green Place
Silver Spring MD 20910

Source Bio-Plastics, Inc.
c/o Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

Sunvolt
c/o Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

Whiplash Mortor Sports, LLC
c/o Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

First Washington Equities, LLC
c/o Robert F. Rood, IV
10309 Holly Hill Place
Potomac MD 20854

Robert F. Rood, III
c/o Jeffrey Orenstein, Esq.
15245 Shady Grove Road, Suite 465
Rockville MD 20850

Grace Rood
c/o Jeffrey Orenstein, Esq.
15245 Shady Grove Road, Suite 465
Rockville MD 20850

Warren Hughes
10305 Brookhaven Lane
Upper Marlboro MD 20772

Nik Helper
28605 Greenberry Drive
Laytonsville MD 20882

Charles Timothy Jewell
1990 Fairfax Drive
Annapolis MD 21401

Thomas D. Murphy, Esq.
Murphy & Mood, PC
31 Wood lane
Rockville MD 20850

United States Trustee
6305 Ivy Lane, Suite 600
Greenbelt MD 20770

**End of Memorandum**